UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PETER MALS<br><br>        Plaintiff,<br><br>v.<br><br>SMITH & NEPHEW, INC.<br><br>        Defendant. | :<br>:<br>:<br>:<br>:  CIVIL ACTION FILE<br>:<br>:  CASE NO.<br>:<br>:<br>:<br>: |

Plaintiff, by and through counsel, and for his complaint against Defendant alleges as follows:

### I. PARTIES

1.      Plaintiff Peter Mals is a resident and citizen of Old Saybrook, Connecticut, who presently resides at 7 Fenwood Road in Middlesex County, Connecticut.

2.      Plaintiff alleges an amount in controversy in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

3.      Defendant, Smith & Nephew, Inc., (hereinafter "Smith & Nephew"), is a Delaware corporation with its principal place of business at 1450 Brooks Road, Memphis, Tennessee 38116. Defendant Smith & Nephew is a resident and citizen of both Delaware and Tennessee.

4.      At all relevant times herein, Smith & Nephew was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related

entities, numerous orthopedic products, including Smith & Nephew "Journey UNI Unicompartmental Knee System" for use in knee replacement surgery.

## II. JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.    Venue in this district is appropriate under 28. U.S.C. §1391 because a substantial part of the events giving rise to this claim occurred in the district. Specifically, Plaintiff, Peter Mals is a resident of and has received medical care and treatment within the State of Connecticut.

## III. FACTUAL BACKGROUND

7.    On November 16, 2017, Plaintiff, Peter Mals, at the age of 58, underwent left knee replacement surgery at Middlesex Hospital in Middletown, Connecticut.

8.    During said surgery, the plaintiff received a knee replacement device designed, manufactured, marketed and sold by Smith & Nephew.

9.    Plaintiff, Peter Mals left knee replacement consisted of the following parts: Smith & Nephew Journey UNI Tibinrt (Reference #71422261); Smith & Nephew Journey UNI Tibial Base (Reference #71422426); and Smith & Nephew Journey UNI Oxinium Femoral Component (Reference #71422347)(hereinafter the "implant components"). Such implant components were designed, manufactured and marketed by defendant.

10.   In January 2018, just two months later from his initial left knee replacement surgery, Plaintiff, Peter Mals underwent an x-ray, for left knee pain and discomfort which

showed the Smith & Nephew implant components had failed internal hardware due to anterior translation of the plastic prosthesis.

11. On January 10, 2018, Plaintiff, Peter Mals underwent surgery to remove and replace the Defendant's failed Smith & Nephew Journey UNI knee implant devices, consisting of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component.

12. As a direct result of the failed Smith & Nephew Journey UNI knee devices, Plaintiff, Peter Mals has suffered significant harm, conscious pain and suffering, physical injury and bodily impairment.

13. As a direct result of the failed Smith & Nephew Journey UNI knee devices, Plaintiff has had to undergo additional medical treatment and surgery as a consequence and faces a potential of multiple knee replacement surgeries in the future.

14. As a direct result of the failed Smith & Nephew Journey UNI knee devices, Plaintiff has suffered significant mental and physical pain in the future.

15. As a direct result of the failed Smith & Nephew Journey UNI knee devices, Plaintiff incurred medical expenses and other economic harm, and will continue to incur such expenses and other economic harm in the future.

16. Plaintiff Peter Mals' injuries as described herein qualify as a permanent and substantial physical deformity, loss of use of a limb, and/or loss of use of a bodily organ system.

17. As a direct result of the failed Smith & Nephew Journey UNI knee devices, Plaintiff has lost income and sustained an impairment to earning capacity.

## IV. FEDERAL REQUIREMENTS

18.  Pursuant to federal law, a medical device is deemed to be adulterated if among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

19.  Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular way, or if it is dangerous to health when in used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

20.  Pursuant to the federal law, manufacturers are not required to comply with FDA regulations of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices. Specifically, manufacturers must keep records and make reports if any medical device may have caused or contributed to death or serious injury, of if the device has malfunctioned in a manner likely to cause or contribute to death or serious injury. Federal law also mandates that the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health. *See* 21 U.S.C. § 360i.

21. Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to access the performance of a device but not including an evaluation of the safety or effectiveness of a device), packaging, storage, and installation of a device conform to current good manufacturing practice (CGMP), as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law. *See* 21 U.S.C. §360j(f).

22. The regulations requiring conformance to good manufacturing practices are set forth in the 21 CFR § 820 *et seq*. As explained in the Federal Register, because the CGMP regulations must apply to a variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a device. Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured, and the manufacturing process employed. Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

23. Pursuant to 21 CFR § 820.1 (c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under § 501(h) of the Federal Food Drug & Cosmetic Act (hereinafter "the Act") (21 U.S.C. §351).

24.  Pursuant to 21 CFR § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. A "quality system" means the original structure, responsibilities, procedures, processes, and resources for implementing quality management. *See* 21 CFR § 820.3(v).

25.  Pursuant to 21 CFR § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

26.  Pursuant to 21 CFR §820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

27.  Pursuant to 21 CFR §820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

28.  Pursuant to 21 CFR §820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

29.  Pursuant to 21 CFR §820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

30. Pursuant to 21 CFR §820.30(g), each manufacturer shall establish and maintain procedures for validating the device design. Device validation shall be performed under defined operating conditions on initial production units under actual or simulated use conditions.

31. Pursuant to 21 CFR §820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

32. Pursuant to 21 CFR §820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before implementation.

33. Pursuant to 21 CFR §820.70(a), each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications. Such process controls shall include the following:

    (a) documented instructions, standard operating procedures (SOP's), and methods that define and control the manner of production;

    (b) monitoring and control of process parameters and component and device characteristics during production;

    (c) compliance with specified reference standards or codes;

    (d) the approval or processes and process equipment; and

    (e) criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples.

34. Pursuant to 21 CFR § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process or procedure.

35. Pursuant to 21 CFR § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

36. Pursuant to 21 CFR § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality.

37. Pursuant to 21 CFR § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed and installed to facilitate maintenance adjustment, cleaning and use.

38. Pursuant to 21 CFR § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

39. Pursuant to 21 CFR § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate compute software for its intended use according to an established protocol.

40. Pursuant to 21 CFR § 820.72, each manufacturer shall ensure that all inspection, measuring, and test equipment, including mechanical, automated, or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results. Each manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked, and maintained.

41. Pursuant to 21 CFR § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures. "Process validation" means establishing by objective evidence that a process consistently produces a result of product meeting its predetermined specifications. *See* 21 CFR § 820.3(z) (1).

42. Pursuant to 21 CFR § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met. Each manufacturer shall ensure that validated processes are performed by qualified individuals.

43. Pursuant to 21 CFR § 820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

44. Pursuant to 21 CFR § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

    (a)    analyzing process, work operations, concessions, quality audit reports, quality records, service records, complaints, return product and other sources of quality data to identifying existing and potential causes of nonconforming product, or other quality problems;

(b) investigating the cause of nonconformities relating to product, processes and the quality system;

(c) identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

(d) verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

(e) implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

(f) ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

(g) submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

45. Upon information and belief, Defendant Smith & Nephew's Journey UNI knee, including the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, is adulterated pursuant to 21 U.S.C. § 351 because Defendant failed to establish and maintain CGMP for its Journey UNI knee parts in accordance with 21 CFR § 820 *et seq.* as set forth above.

46. Upon information and belief, Defendant failed to establish and maintain CGMP with respect to quality audits, quality testing and process validation for its Journey UNI knee, including the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component.

47. As a result of Defendant's failure to establish and maintain CGMP, Defendant Smith & Nephew's Journey UNI knee, including the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, was defective and failed,

resulting in a breakage and failure of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component and injured the plaintiff.

48.     If Defendant had complied with the federal requirements regarding CGMP, as aforesaid, Defendant, Smith & Nephew's Journey UNI knee, including the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, would have been manufactured properly such that it would not have fractured and failed and would not have been resulted in injuries to Plaintiff.

49.     Upon information and belief, Defendant Smith & Nephew's Journey UNI knee, including the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, is misbranded because among other things, it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. See 21 U.S.C. § 352.

## V. COUNT ONE STRICT PRODUCTS LIABILITY: MANUFACTURING DEFECT CONN. GEN. STAT. § 52-572 (m)

50.     Plaintiff hereby incorporates by reference, as fully set out herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

51.     Defendant is the manufacturer, designer, distributor, seller and/or supplier of orthopedic devices including the Smith & Nephew Journey UNI Knee, consisting of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, for use in knee replacement surgery.

52.     The Smith & Nephew UNI knee, consisting of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, manufactured,

designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendant, was defective in its manufacture and construction when it left the hands of Defendant in that it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer and/or applicable federal requirements for these medical devises, posing a serious risk of injury and death.

53. The Smith & Nephew Journey UNI knee, consisting of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, was defective in manufacturing and deviated in a material way from the design specifications and/or performance standards such that the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component became dislocated causing much deformity of the polyethylene insert, through no fault of Plaintiff Mals.

54. The Smith & Nephew Journey UNI knee, consisting of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, was defective in manufacturing and deviated in a material way from the design specification and/or performance standards causing previous recalls of the device.

55. As a direct and proximate result of Plaintiff Peter Mals' use of Defendant Smith & Nephew Journey UNI knee Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## VI. COUNT TWO STRICT PRODUCTS LIABILITY: DESIGN DEFECT

56.     Plaintiff hereby incorporates by reference, as fully set out herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

57.     Defendant is the manufacturer, designer, distributor, seller, and/or supplier of orthopedic devices including the Smith & Nephew Journey UNI knee, consisting of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, for use in knee replacement surgery.

58.     The Smith & Nephew Journey UNI knee, manufactured and supplied by Defendant, was defective in design or formulation in that, when it left the hands of the Defendant, the foreseeable risks of the product exceeded the benefits associated with its design or formulation, and/or it failed to comply with the federal requirements for these medical devices.

59.     The Smith & Journey UNI knee was defective in design such that the risks of breakage and deterioration of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component exceed the benefits of the device.

60.     The Smith & Journey UNI knee was defective in design such that the breakage of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component was more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.

61.     The Smith & Journey UNI knee was defective in that at the time the product left the control of the Defendant, a practical and technically feasible alternative design was available (their other knee products/ other manufacturers) that would have prevented the

harm for which Plaintiff Peter Mals seeks to recover without substantially impairing the usefulness or intended purpose of the device.

62. As a direct and proximate result of Plaintiff Peter Mals' use of the Smith & Nephew UNI Journey Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce by Defendant, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## VII. COUNT THREE STRICT PRODUCTS LIABILITY: DEFECT DUE TO NONCONFORMANCE WITH REPRESENTATIONS

63. Plaintiff incorporates by reference, as fully set out herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

64. Defendant is the manufacturer, designer, distributor, seller, and/or supplier of the orthopedic devices including the Smith & Nephew Journey UNI knee, consisting of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, for use in knee replacement surgery.

65. The Smith & Journey UNI knee, manufactured and supplied by Defendant was defective in that, when it left the hands of Defendant, it did not conform to representations made by Defendant concerning the product and/or with applicable federal requirements.

66. Plaintiff and/or Plaintiff Peter Mals' physicians, at the time they selected the Smith & Nephew UNI knee parts to be used in Plaintiff's original surgery, justifiably

relied upon Defendant's representations that the Smith & Nephew Journey UNI knee was safe for use in knee replacement surgery and would conform to the representations regarding the character and quality of an appropriate device to be used in the knee replacement surgery.

67. As a direct and proximate result of Plaintiff Peter Mals' use of the Smith & Nephew Journey UNI knee, including the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, and Plaintiff's physician's reliance on Defendant's representations regarding the character and quality of the Journey UNI knee, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## VIII. COUNT FOUR STRICT PRODUCT LIABILITY: FAILURE TO WARN CONN. GEN. STAT. § 52-572q

68. Plaintiff incorporates by reference, as fully set out herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

69. Defendant is the manufacturer, designer, distributor, seller, and/or supplier of the orthopedic devices including the Smith & Nephew Journey UNI knee, consisting of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, for use in knee replacement surgery.

70. The Smith & Journey UNI knee, consisting of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, implanted into Plaintiff herein contained no warnings or, in the alternative, inadequate warnings as to the risks that the product could cause failure of the device.

Case 3:19-cv-01770-VLB   Document 1   Filed 11/11/19   Page 16 of 20

71.     The warnings that accompanied the Smith & Nephew UNI knee failed to provide that the level of information that an ordinary consumer, including Plaintiff and Plantiff's physicians herein, would expect when using the implants in a manner reasonably foreseeable to the Defendant. Moreover, the Smith & Nephew Journey UNI knee left the Defendant's control without an adequate warning or instruction, and created an unreasonably dangerous condition in that Defendant, knew or in the exercise of ordinary care should have known that the Smith & Nephew UNI knee, consisting of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component posed a substantial risk of harm.

72.     Had the Plaintiff received proper or adequate warnings to the risks associated with the Smith & Nephew Journey UNI knee, Plaintiff would not have used the device.

73.     As a direct and proximate result of Plaintiff Peter Mals' use of the Smith & Nephew UNI Journey Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component, as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce by Defendant, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

### IX. COUNT FIVE: NEGLIGENCE CONN. GEN. STAT. § 52-572 (h)

74.     Plaintiff incorporates by reference, as fully set out herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

75.     Defendant Smith & Nephew, as the manufacturer of a medical device being used by physicians for patients in orthopedic surgery, had a duty of reasonable care to provide

16
Polito & Associates, LLC
567 Vauxhall Street Ext., Suite 230 ♦ Waterford ♦ Connecticut  06385
(860) 447-3300 ♦ Fax (860) 447-3389

a product which would not deceive or misrepresent safety, quality, characteristic, etc., of medical devices they design, manufacture, distribute, sell and supply.

76.     Defendant Smith & Nephew had a duty of care to manufacture and market its Journey UNI knee in a reasonably safe manner.

77.     Defendant Smith & Nephew breached those duties of care in one or more of the following ways, in that Smith & Nephew:

- (a) designed, manufactured and/or marketed a knee replacement system it knew had a propensity to become loose and deteriorate which was dangerous given its intended function;

- (b) designed, manufactured and/or marketed a knee replacement system it knew or should have known had a propensity for wear, to corrode, and to cause a fracture of the prostheses rendering it unfit for its design use due to the materials employed;

- (c) designed, manufactured and/or marketed a knee replacement system with materials it knew or should have known were not reasonably safe for their intended use;

- (d) designed, manufactured and/or marketed a knee replacement system that is defective in that it has a high incidence of deteriorating and fracturing;

- (e) marketed said knee replacement system which failed to comply with federal requirements in such a way as to mislead customers regarding its safety and efficacy;

- (f) manufactured said knee replacement system which failed to comply with performance standards without adequate quality controls;

- (g) designed, manufactured, and/or marketed a knee replacement system using an inferior alloy in which it knew or should have known would cause deterioration/fretting of the prosthesis;

- (h) failed to warn the Plaintiff and/or his physicians as to the known dangers involving in the knee replacement system, as aforesaid, at the time of his initial surgery or prior thereto;

  (h) failed in its designed and manufacturing process to ensure that the knee replacement system was safe and met all applicable design and manufacturing requirements;

  (i) failed to instruct consumers in general, and Plaintiff or his physician specifically, oh how to safely use the knee replacement system, including failure to instruct physicians specifically as to the "minimal bone and ligament removal" technique, as that term is defined by Defendant, for which the system was designed, manufactured, and/or marketed to them;

or  (j) otherwise had actual knowledge of the known danger involving the knee replacement system but failed to take adequate steps to warn the plaintiff his physicians.

78. As a direct and proximate result of the Defendant's breach of its duty and negligent marketing, manufacturing, and design defects about its Journey UNI knee, Peter Mals used Defendant's Journey UNI knee, consisting of the Journey UNI Tibinrt, Journet UNI tibial base and the Journey UNI oxinium femoral component that the above combination of factors led to the failure and deterioration of the Plaintiff's knee prostheses.

79. As a direct consequence of the aforesaid negligence, the Plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment against Defendant as follows:

1. Awarding compensatory damages;

2. Awarding the costs and expenses of this litigation to Plaintiff;

3. Awarding reasonable attorney's fees and costs to Plaintiff as provided by law; and

4. Granting all such other relief as the Court deems necessary, just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

                                                THE PLAINTIFF

                                                By_____
                                                    James M. Harrington
                                                    Polito & Associates, LLC